Eric Lechtzin (SBN 248958)
**EDELSON LECHTZIN LLP**
411 S. State Street, Suite N-300
Newtown, PA 18940
Telephone: (215) 867-2399
Facsimile: (267) 685-0676
elechtzin@edelson-law.com

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| RHONDA ATTA, individually, and on behalf of all others similarly situated, | Case No.: 2:25-cv-02549 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| vs. | |
| CALIFORNIA CRYOBANK, LLC, | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

Plaintiff Rhonda Atta ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Defendant California Cryobank, LLC, ("CCB" or "Defendant"), to obtain damages, restitution, and injunctive relief. Plaintiff makes the following allegations upon information and belief, except as to her own actions, the investigation of their counsel, and facts that are a matter of public record.

## NATURE OF THE ACTION

1.     This class action arises out of Defendant California Cryobank, LLC's failure to properly secure, safeguard, encrypt, and/or timely and adequately destroy Plaintiff's and Class members' (defined below) sensitive personal identifiable

information that it had acquired and stored for its business purposes.

2.      Defendant is one of the world's largest reproductive tissue banks, providing "the highest quality reproductive and stem cell products and services, guided by dedicated customer focus, unmatched scientific excellence and innovative leadership."[1]

3.      According to a "Notice of Data Security Incident" posted on Maine.gov's website, a data breach occurred on Defendant's network between April 20, 2024, and April 22, 2024 (the "Data Breach").[2]

4.      Due to Defendant's data security failures which resulted in the Data Breach, cybercriminals were able to target Defendant's computer systems and exfiltrate highly sensitive and personally identifiable information ("PII") and protected health information ("PHI") (collectively, the "Private Information") belonging to Plaintiff and Class members. As a result of this Data Breach, the Private Information of Plaintiff and Class members remains in the hands of those cybercriminals.

5.      Defendant's notice states that, upon learning of the Data Breach, "CCB isolated the computers from its IT network and launched an investigation. Through its investigation, CCB determined that an unauthorized party gained access to its IT environment and may have accessed and/or acquired files maintained on certain computer systems between April 20, 2024, and April 22, 2024. CCB undertook a

---

[1] https://www.cryobank.com/about-us/ (last visited March 24, 2025)
[2] https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/6b6aacae-67b7-414e-be1a-ea17b44a7f12.html (last visited March 24, 2025)

comprehensive search and review of the files that may have been accessed and/or acquired as a result of the incident."[3] Additionally, CCB states "[t]o help prevent something like this from happening again, CCB has implemented, and will continue to adopt, additional safeguards and technical security measures to further protect and monitor its systems."[4] However, despite apparently learning of the Data Breach on or about October 4, 2024 and determining that Private Information was involved in the breach, Defendant did not begin sending notices to the victims of the Data Breach (the "Notice of Data Breach Letters") until March 14, 2025.

6.      The Private Information compromised in the Data Breach included current and former members' PII and PHI, including Plaintiff's. This Private Information included, but is not limited to: patients' full names, bank accounts and routing numbers, Social Security numbers, driver's license numbers, payment card numbers, and/or health insurance information.[5]

7.      The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cybersecurity procedures and protocols necessary to protect Plaintiff's and Class members' Private Information with which it was entrusted for either treatment or employment or both.

8.      Plaintiff brings this class action lawsuit on behalf of herself and all other similarly situated persons to address Defendant's inadequate safeguarding of Class members' Private Information that it collected and maintained, and for failing

---

[3] *Id.* Appendix.
[4] *Id.*
[5] https://informationsecuritybuzz.com/california-cryobank-alerts-data-breach/ (last visited Mar. 24, 2025).

to provide timely and adequate notice to Plaintiff and other Class members that their information had been subject to the unauthorized access of an unknown third party and failing to include in that belated and inadequate notice precisely what specific types of information were accessed and taken by cybercriminals.

9.      Defendant maintained the Private Information in a reckless manner. In particular, the Private Information was maintained on Defendant's computer network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiff's and Class members' Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take steps necessary to secure the Private Information from those risks left that network in a dangerous condition.

10.     Defendant disregarded the rights of Plaintiff and Class members by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiff's and Class members' Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class members with prompt and full notice of the Data Breach.

11.     In addition, Defendant failed to properly monitor the computer network and systems that housed the Private Information. Had Defendant properly monitored its computer network and systems, it would have discovered the massive intrusion sooner rather than allowing cybercriminals almost a month of unimpeded access to Plaintiff's and Class members' PII and PHI.

12.     Plaintiff's and Class members' identities are now at risk because of

Defendant's negligent conduct since the Private Information that Defendant collected and maintained is now in the hands of data thieves.

13. Armed with the Private Information accessed in the Data Breach, data thieves can commit a variety of crimes including: opening new financial accounts in Class members' names, taking out loans in Class members' names, using Class members' information to obtain government benefits, filing fraudulent tax returns using Class members' information, filing false medical claims using Class members' information, obtaining driver's licenses in Class members' names but with another person's photograph, and giving false information to police during an arrest.

14. As a result of the Data Breach, Plaintiff and Class members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class members must now and for years into the future closely monitor their financial accounts to guard against identity theft.

15. Plaintiff and Class members may also incur out of pocket costs for, *e.g.,* purchasing credit monitoring, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

16. Through this Complaint, Plaintiff seeks to remedy these harms on behalf of herself and all other similarly situated individuals whose Private Information was accessed during the Data Breach.

17. Accordingly, Plaintiff brings this action against Defendant seeking redress for its unlawful conduct, and asserting claims for: (i) negligence, (ii) negligence *per se*, (iii) breach of contract, (iv) breach of implied contract, (v) breach of fiduciary duty; (vi) unjust enrichment; (vii) invasion of privacy; and (viii) declaratory and injunctive relief.

18. Plaintiff seeks remedies including, but not limited to, compensatory

damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, as well as long-term and adequate credit monitoring funded by Defendant, and declaratory relief.

## PARTIES

19.    Plaintiff Rhonda Atta is and at all times mentioned herein was an individual citizen of the State of Texas, and a CCB patient. Plaintiff Atta received notice of the Data Breach dated March 14, 2025, attached at Exhibit A.

20.    Like Plaintiff, other potential Class members received similar notices informing them that their PII was exposed in the Data Breach on or about March 14, 2025.

21.    Defendant CCB is a Delaware Limited Liability company registered to conduct business in California with its principal place of business at 11915 La Grange Avenue, Los Angeles, CA 90025, California.

## JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d). The amount in controversy in this Class action exceeds $5,000,000, exclusive of interest and costs, and there are numerous Class members who are citizens of states other than Defendant's state of citizenship.

23.    This Court has personal jurisdiction over the parties in this case. Defendant CCB conducts business in this District and is a citizen of this District by virtue of having its principal place of business located in this District.

24.    Venue is proper in this District under 28 U.S.C. §1391(b) because CCB maintains a headquarters in this District and regularly conducts business in this District.

# **FACTUAL ALLEGATIONS**

## ***Defendant's Business***

25.     Defendant CCB was founded in 1977 and represents itself as "industry leader for almost 40 years, California Cryobank combines the world's most comprehensive selection of stringently screened sperm donors with extensive quality control, a highly trained staff, and valuable post-conception services to offer the most complete sperm banking experience available."[6]

26.     In the ordinary course of participating in the patients' benefits Defendant offers, each patient must provide (and Plaintiff did provide) Defendant with sensitive, personal, and private information, such as their:

- Name, address, phone number, and email address;

- Date of birth;

- Social Security number;

- Marital status;

- Employer with contact information;

- Primary and secondary insurance policy holders' name and address;

- Demographic information;

- Driver's license or state or federal identification;

- Information relating to the individual's medical and medical history;

- Insurance information and coverage;

- Banking and/or credit card information, including password, routing number and;

_____

[6] https://www.cryobank.com/why-use-us/ (last visited Mar. 24, 2025).

- Health Insurance and Medical Information.[7]

27.    Defendant also creates and stores medical records and other protected health information for its patients, records of treatments and diagnoses.

28.    Upon information and belief, Defendant's Privacy Policy ("Privacy Policy")[8] makes clear that it understands that its patients' Private Information is personal and must be protected by law.

29.    Defendant agreed to and undertook legal duties to maintain the protected health and personal information entrusted to it by Plaintiff and Class members safely, confidentially, and in compliance with all applicable laws, including the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45, and the Health Insurance Portability and Accountability Act ("HIPAA").

30.    Yet, through its failure to properly secure Plaintiff's and Class members' Private Information, Defendant failed to meet its own promises of patient privacy.

31.    The information held by Defendant in its computer system and network included Plaintiff's and Class members' highly sensitive Private Information.

### *The Data Breach*

32.    A data breach occurs when cyber criminals intend to access and steal Private Information that has not been adequately secured by a business entity like Defendant.

33.    According to Defendant's website Notice, it learned of a cyberattack on its computer systems on or about October 04, 2024.[9]

---

[7] https://www.cryobank.com/privacy-policy/ (last visited Mar. 24, 2025).
[8] *Id.*
[9] *See* n.3, *supra.*

34.   Since the Data Breach, according to cybersecurity news sources, at least one ransomware group, Termite, has claimed responsibility for the attack.[10] Termite claimed the theft of data from CCB's systems, demanded a ransom, and has reportedly leaked the stolen data.[11]

35.   Termite is one of the most active hackers, having hacked companies around the world including France, Canada, Germany, Oman, and the USA.[12] Termite claims to have exfiltrated Plaintiffs' Private Information and then encrypted and published the files.[13]

36.   Presently, however, Defendant has provided no public information on the ransom demand or payment.

37.   In January 2023, two years before the attack, HHS created a presentation specifically for healthcare providers and IT departments, warning entities like Defendant of the severe threats posed by cybercriminal groups.[14] Within the healthcare industry, the risk of a cyberattack is well-known and preventable with adequate security systems in place.

38.   On or about March 14, 2025, months after Defendant learned that the Class members' Private Information was attacked by cybercriminals, Defendant's

---

[10] https://www.cyberdaily.au/security/11870-california-cryobank-confirms-year-old-cyber-attack (last visited Mar. 24, 2025).

[11] *Id.*

[12] https://www.broadcom.com/support/security-center/protection-bulletin/termite-ransomware (last visited Mar. 24, 2025).

[13] https://www.cyberdaily.au/security/11870-california-cryobank-confirms-year-old-cyber-attack (last visited Mar. 24, 2025).

[14] https://www.hhs.gov/sites/default/files/royal-blackcat-ransomware-tlpclear.pdf (last visited Mar. 24, 2025).

members began receiving their notices of the Data Breach informing them that its investigation determined that their Private Information was accessed.

39.    Defendant's notice letters list time-consuming, generic steps that victims of data security incidents can take, such as getting a copy of a credit report or notifying law enforcement about suspicious financial account activity. Also, Plaintiff would have to affirmatively sign up for and a call center number that victims may contact with questions. Defendant offered one year of credit monitoring for members of the class and Defendant offered no other substantive steps to help victims like Plaintiff and Class members to protect themselves. On information and belief, Defendant sent a similar generic letter to all other individuals affected by the Data Breach.

40.    Defendant's data security obligations were particularly important given the substantial increase in cyberattacks in recent years.

41.    Defendant knew or should have known that its electronic records would be targeted by cybercriminals.

42.    Defendant had obligations created by HIPAA, FTCA, contract, industry standards, common law, and representations made to Plaintiff and Class members to keep their Private Information confidential and to protect it from unauthorized access and disclosure.

43.    Plaintiff and Class members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

**The Data Breach was a Foreseeable Risk of which Defendant was on Notice.**

44.    It is well known that PII and PHI, including Social Security numbers in

particular, are valuable commodities and a frequent, intentional target of cyber criminals. Companies that collect such information, including Defendant, are well aware of the risk of being targeted by cybercriminals.

45.    Individuals place a high value on the privacy of their PII and PHI. Identity theft causes severe negative consequences to its victims, as well as severe distress and hours of lost time trying to fight against the impact of identity theft.

46.    A data breach increases the risk of becoming a victim of identity theft. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice, "[a] direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (*e.g.*, postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss."[15]

47.    Individuals, like Plaintiff and Class members, are particularly concerned with protecting the privacy of their Social Security numbers, which are the key to stealing any person's identity and is likened to accessing one's DNA for hacker's purposes.

48.    Data Breach victims suffer long-term consequences when their Social

---

[15] "Victims of Identity Theft, 2018," U.S. Department of Justice (April 2024, NCJ 256085) available at: https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last visited Mar. 24, 2025).

Security numbers are taken and used by hackers. Even if they know their Social Security numbers are being misused, Plaintiff and Class members cannot obtain new numbers unless they become a victim of Social Security number misuse.

49.    The Social Security Administration has warned that "a new number probably won't solve all your problems. This is because other government agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So, using a new number won't guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same."[16]

50.    Additionally, in 2021, there was a 15.1% increase in cyberattacks and data breaches from 2020. Over the next two years, in a poll of security executives, they have predicted an increase in attacks from "social engineering and ransomware" as nation-states and cybercriminals grow more sophisticated. Unfortunately, these preventable cases will largely come from "misconfigurations, human error, poor maintenance, and unknown assets."[17]

51.    Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, and hopefully can ward off a cyberattack.

---

[16] https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Mar. 24, 2025).
[17] https://www.forbes.com/sites/chuckbrooks/2022/06/03/alarming-cyber-statistics-for-mid-year-2022-that-you-need-to-know/?sh=176bb6887864 (last visited Mar. 24, 2025).

52.     According to an FBI publication, "[r]ansomware is a type of malicious software, or malware, that prevents you from accessing your computer files, systems, or networks and demands you pay a ransom for their return. Ransomware attacks can cause costly disruptions to operations and the loss of critical information and data."[18] This publication also explains that "[t]he FBI does not support paying a ransom in response to a ransomware attack. Paying a ransom doesn't guarantee you or your organization will get any data back. It also encourages perpetrators to target more victims and offers an incentive for others to get involved in this type of illegal activity."[19]

53.     Despite the prevalence of public announcements of data breach and data security compromises, and despite its own acknowledgments of data security compromises, and despite its own acknowledgment of its duties to keep PII and PHI private and secure, Defendant failed to take appropriate steps to protect the PII and PHI of Plaintiff and the proposed Class from being compromised.

### Data Breaches are Rampant in Healthcare.

54.     Defendant's data security obligations were particularly important given the substantial increase in data breaches in the healthcare industry preceding the date of the breach.

55.     According to an article in the HIPAA Journal posted on October 14, 2022, cybercriminals hack into medical practices for their "highly prized" medical records. "[T]he number of data breaches reported by HIPAA-regulated entities

---

[18] https://www.fbi.gov/how-we-can-help-you/safety-resources/scams-and-safety/common-scams-and-crimes/ransomware (last visited Mar. 24, 2025).
[19] *Id.*

continues to increase every year. 2021 saw 714 data breaches of 500 or more records reported to the [HHS' Office for Civil Rights] OCR – an 11% increase from the previous year. Almost three-quarters of those breaches were classified as hacking/IT incidents."[20]

56.    More than 144 million Americans' medical information was stolen or exposed during 2024.[21] This fact represents the continuation of record-breaking health care data breaches in the last several years. In 2021, there were a record 1,862 data breaches, surpassing both 2020's total of 1,108 and the previous record of 1,506 set in 2017.[22]

57.    Healthcare organizations are easy targets because "even relatively small healthcare providers may store the records of hundreds of thousands of patients. The stored data is highly detailed, including demographic data, Social Security numbers, financial information, health insurance information, and medical and clinical data, and that information can be easily monetized."[23]

58.    The HIPAA Journal article goes on to explain that patient records, like those stolen from Defendant, are "often processed and packaged with other illegally obtained data to create full record sets (fullz) that contain extensive information on individuals, often in intimate detail." The record sets are then sold on dark web sites to other criminals and "allows an identity kit to be created, which can then be sold

---

[20] https://www.hipaajournal.com/why-do-criminals-target-medical-records/ (last visited Mar. 24, 2025).
[21] *See* n.11, *supra*.
[22] https://www.cnet.com/tech/services-and-software/record-number-of-data-breaches-reported-in-2021-new-report-says/ (last visited Mar. 24, 2025).
[23] *Id.*

for considerable profit to identity thieves or other criminals to support an extensive range of criminal activities."[24]

59.    Data breaches such as the one experienced by Defendant have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, can prepare for, and hopefully can ward off a potential attack.

60.    In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in the past year.[25]

61.    HHS data shows that more than 39 million patients' information was exposed in the first half of 2023 in nearly 300 incidents and that healthcare beaches have doubled between 2020 and 2023, according to records compiled from HHS data by Health IT Security.[26]

62.    According to Advent Health University, when an electronic health record "lands in the hands of nefarious persons, the results can range from fraud to identity theft to extortion. In fact, these records provide such valuable information that hackers can sell a single stolen medical record for up to $1,000."[27]

63.    The significant increase in attacks in the healthcare industry and the attendant risk of future attacks is widely known to the public and to anyone in that

_____

[24] *Id.*

[25] *See* Maria Henriquez, *Iowa City Hospital Suffers Phishing Attack*, Security Magazine (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack (last visited Mar. 24, 2025).

[26] https://healthitsecurity.com/features/biggest-healthcare-data-breaches-reported-this-year-so-far (last visited Mar. 24, 2025).

[27] https://www.ahu.edu/blog/data-security-in-healthcare (last visited Mar. 24, 2025).

industry, including Defendant.

### *Defendant Failed to Comply with FTC Guidelines.*

64.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

65.    In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal patient information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems.[28] The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[29]

66.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for

_____

[28] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Mar. 24, 2025).

[29] *Id.*

security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

67.     The FTC has brought enforcement actions against businesses, like that of Defendant, for failing to adequately and reasonably protect patient data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

68.     These FTC enforcement actions include actions against healthcare providers like Defendant. *See*, *e.g.*, *In the Matter of LabMD, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

69.     Defendant failed to properly implement basic data security practices.

70.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' PII and PHI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

71.     Defendant was at all times fully aware of its obligation to protect patients' PII and PHI. Defendant was also aware of the significant repercussions that would result from its failure to do so.

### Defendant Failed to Comply with Industry Standards.

72.     As shown above, experts studying cybersecurity routinely identify healthcare providers as being particularly vulnerable to cyberattacks because of the

value of the PII and PHI that they collect and maintain.

73.    Several best practices have been identified that a minimum should be implemented by healthcare providers like Defendant, including but not limited to: educating all employees; utilizing strong passwords; creating multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; using multi-factor authentication; protecting backup data, and; limiting which employees can access sensitive data.

74.    Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

75.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

76.    These frameworks are existing and applicable industry standards in the healthcare industry, yet Defendant failed to comply with these accepted standards, thereby opening the door to and failing to thwart the Data Breach.

### Defendant's Conduct Violates HIPAA.

77.    HIPAA requires covered entities such as Defendant to protect against

reasonably anticipated threats to the security of sensitive patient health information (PHI).

78.    Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.

79.    Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, *et seq*. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PII like the data Defendant left unguarded. The HHS subsequently promulgated multiple regulations under the authority of the Administrative Simplification provisions of HIPAA. These rules include 45 C.F.R. § 164.306(a)(1-4); 45 C.F.R. § 164.312(a)(1); 45 C.F.R. § 164.308(a)(1)(i); 45 C.F.R. § 164.308(a)(1)(ii)(D), and 45 C.F.R. § 164.530(b).

80.    A Data Breach, such as the one Defendant experienced, is considered a breach under the HIPAA rules because there is an access of PHI not permitted under the HIPAA Privacy Rule:

> A breach under the HIPAA Rules is defined as, "...the acquisition, access, use, or disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rule] which compromises the security or privacy of the PHI."

45 C.F.R. 164.40.

81.    Defendant's Data Breach resulted from a combination of insufficiencies that demonstrate its failure to comply with safeguards mandated by HIPAA.

### *Defendant Breached its Obligations to Plaintiff and Class.*

82.    Defendant breached its obligations to Plaintiff and Class members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and its patients' data. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a.  Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b.  Failing to adequately protect patients' Private Information;

c.  Failing to properly monitor its own data security systems for existing intrusions;

d.  Failing to ensure that vendors with access to Defendant's protected health data employed reasonable security procedures;

e.  Failing to ensure the confidentiality and integrity of electronic PHI it created, received, maintained, and/or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

f.  Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

g.  Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1)(i);

h.  Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

i.  Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

j.  Failing to protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

k.  Failing to ensure compliance with HIPAA security standard rules by Defendant's workforce in violation of 45 C.F.R. § 164.306(a)(4);

l.  Failing to train all members of Defendant's workforce effectively on the policies and procedures regarding data security, as well as PHI, as necessary and appropriate for the members of its workforces to carry out their functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b); and/or

m. Failing to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as it had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 CFR 164.304 definition of encryption).

83.    As the result of maintaining its computer systems in manner that required security upgrading, inadequate procedures for handling emails containing ransomware or other malignant computer code, and inadequately trained employees who opened files containing the ransomware virus, Defendant negligently and

unlawfully failed to safeguard Plaintiff's and Class members' Private Information.

84.     Accordingly, as outlined below, Plaintiff and Class members now face an increased risk of fraud and identity theft.

### Data Breaches Put Consumers at an Increased Risk
### Of Fraud and Identify Theft

85.     Data Breaches such as the one Plaintiff and Class members experienced cause significant disruption to the overall daily lives of victims affected by the attack.

86.     In 2019, the United States Government Accountability Office released a report addressing the steps consumers can take after a data breach.[30] Its appendix of steps consumers should consider, in extremely simplified terms, continues for five pages. In addition to explaining specific options and how they can help, one column of the chart explains the limitations of the consumers' options. *See* GAO chart of consumer recommendations, reproduced and attached as Exhibit B.  It is clear from the GAO's recommendations that the steps Data Breach victims (like Plaintiff and Class) must take after a breach like Defendant's are both time consuming and of only limited and short-term effectiveness.

87.     The GAO has long recognized that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."

88.     The FTC, like the GAO, recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing

---

[30] https://www.gao.gov/assets/gao-19-230.pdf (last visited Mar. 24, 2025).

their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[31]

89.     Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

90.     Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information.

91.     Theft of Private Information is also gravely serious. PII/PHI is valuable property.[32]

92.     It must also be noted there may be a substantial time lag – measured in years – between when harm occurs versus when it is discovered, and also between when Private Information and/or financial information is stolen and when it is used. According to GAO:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use

---

[31] *See* https://www.identitytheft.gov/Steps (last visited Mar. 24, 2025).

[32] *See, e.g.,* John T. Soma, *et al*, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

> of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

*See* 2007 GAO Report, at p. 29.

93.    Private Information and financial information are such valuable commodities to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

94.    There is a strong probability that the entirety of the stolen information has been dumped on the black market or will be dumped on the black market, meaning Plaintiff and Class members are at an increased risk of fraud and identity theft for many years into the future. This is evidenced by the fraud that has already taken place in Plaintiff Atta's case, as discussed in further detail below. Thus, Plaintiff and Class members must vigilantly monitor their financial and medical accounts for many years to come.

95.    As the HHS warns, "PHI can be exceptionally valuable when stolen and sold on a black market, as it often is. PHI, once acquired by an unauthorized individual, can be exploited via extortion, fraud, identity theft and data laundering. At least one study has identified the value of a PHI record at $1000 each."[33]

96.    Furthermore, the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for

---

[33] https://www.hhs.gov/sites/default/files/cost-analysis-of-healthcare-sector-data-breaches.pdf at 2 (citations omitted) (last visited Mar. 24, 2025).

additional credit lines.[34] Such fraud may go undetected until debt collection calls commence months, or even years, later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity.[35] Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security Number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

97.    Moreover, it is not an easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[36]

98.    This data, as one would expect, commands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black

_____

[34] *Identity Theft and Your Social Security Number*, Social Security Administration, at 1. Available at https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Mar. 24, 2025).

[35] *Id.* at 4.

[36] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited Mar. 24, 2025 ).

market."[37]

99.    In recent years, the medical and financial industries have experienced disproportionally higher numbers of data theft events than other industries. Defendant knew or should have known this and strengthened its data systems accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

### PLAINTIFF ATTA'S EXPERIENCES

100.    Plaintiff Atta is and was Defendant's patient at all times relevant to this Complaint. Plaintiff Atta received a Notice of Data Breach Letter, related to Defendant's Data Breach that is dated March 14, 2025. *See* Exhibit A.

101.    The Notice Letter that Plaintiff received does not explain exactly which parts of her PII and PHI were accessed and taken but instead generically states that the files contained her name, "date of birth, dates of service, medical record number, patient account number, medical treatment/diagnosis information, and health insurance policy number."

102.    Plaintiff Atta is especially alarmed by the vagueness in the Notice Letter regarding her stolen extremely private medical information, including her PII/PHI, as among the breached data on Defendant's computer system.

103.    Since the Data Breach, Plaintiff Atta has tried to mitigate the damage by changing her passwords, contacting the credit bureaus as Defendant instructed,

---

[37] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, Computer World (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited March 24, 2025 ).

and monitoring her financial accounts for about 2 and a half hours per week. This is more time than she spent prior to learning of the Defendant's Data Breach. Having to do this every week not only wastes her time as a result of Defendant's negligence, but it also causes her great anxiety.

104.    Soon after the Data Breach, Plaintiff Atta began receiving an excessive number of spam calls on the same cell phone number provided to Defendant on her records. These calls are a distraction, must be deleted, and waste time each day. Given the timing of the Data Breach, she believes that the calls are related to her stolen PII.

105.    Plaintiff Atta is aware that cybercriminals often sell Private Information, and once stolen, it is likely to be abused months or even years after Defendant's Data Breach.

106.    Plaintiff has suffered imminent and impending injury arising from the present and ongoing risk of fraud, identity theft, and misuse resulting from her PII being placed in the hands of unauthorized third parties and possibly criminals. Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach.

107.    Plaintiff has experienced anxiety and increased concerns arising from the fact that her PII has been or will be misused and from the loss of her privacy.

108.    The risk is not hypothetical. Here, a known hacking group intentionally stole the data, misused it, threatened to publish, or has published it on the Dark Web, and the sensitive information, including names and Social Security numbers, is the type that could be used to perpetrate identity theft or fraud.

109.    Plaintiff further suffered actual injury in the form of damages to and diminution in the value of Plaintiff's PII—a form of intangible property that Plaintiff

entrusted to Defendant, which was compromised in and because of the Data Breach. Future identity theft monitoring is reasonable and necessary, and such will include future costs and expenses.

110.    Plaintiff has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

111.    Had Plaintiff Atta been aware that Defendant's computer systems were not secure, she would not have entrusted Defendant with her PII and PHI.

## PLAINTIFF'S AND CLASS MEMBERS' COMMON INJURIES

112.    To date, Defendant has done absolutely nothing to compensate Plaintiff and Class members for the damages they sustained in the Data Breach.

113.    Defendant offered only one year of credit monitoring to class members.

114.    Defendant fails to offer any compensation to victims of the Data Breach, who commonly face multiple years of ongoing identity theft, and it entirely fails to provide any compensation for its unauthorized release and disclosure of Plaintiff's and Class members' Private Information, out of pocket costs, and the time they are required to spend attempting to mitigate their injuries.

115.    Furthermore, Defendant's failure to safeguard Plaintiff's and Class members' Private Information, places the burden squarely on Plaintiff and the Class, rather than on the Defendant, to investigate and protect themselves from Defendant's tortious acts and omissions resulting in the Data Breach. Defendant merely sent instructions to Plaintiff and Class members about actions they can affirmatively take to protect themselves.

116.    Plaintiff and Class members have been damaged by the compromise and exfiltration, by cyber-criminals, of their Private Information as a result of the

Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

117.  Plaintiff and Class members were damaged in that their Private Information is now in the hands of cyber criminals being sold and potentially for sale for years into the future.

118.  As a direct and proximate result of Defendant's conduct, Plaintiff and Class members have been placed at an actual, imminent, and substantial risk of harm from fraud and identity theft, especially in light of the actual fraudulent misuse of the Private Information that has already taken place, as alleged herein.

119.  As a direct and proximate result of Defendant's conduct, Plaintiff and Class members have been forced to expend time dealing with the effects of the Data Breach.

120.  Plaintiff and Class members face substantial risk of out-of-pocket fraud losses, such as loans opened in their names, medical bills in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft. Plaintiff and Class members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

121.  Plaintiff and Class members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Private Information, as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class members.

122.  Plaintiff and Class members also suffered a loss of value of their Private Information when it was acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

123.   Plaintiff and Class members have spent and will continue to spend significant amounts of time monitoring their financial accounts and records for misuse.

124.   Plaintiff and Class members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

    a.  Finding fraudulent charges;

    b.  Canceling and reissuing credit and debit cards;

    c.  Purchasing credit monitoring and identity theft prevention;

    d.  Monitoring their medical records for fraudulent charges and data;

    e.  Addressing their inability to withdraw funds linked to compromised accounts;

    f.  Taking trips to banks and waiting in line to obtain funds held in limited accounts;

    g.  Placing "freezes" and "alerts" with credit reporting agencies;

    h.  Spending time on the phone with or at a financial institution to dispute fraudulent charges;

    i.  Contacting financial institutions and closing or modifying financial accounts;

    j.  Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

    k.  Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

l.  Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

125.   Moreover, Plaintiff and Class members have an interest in ensuring that their Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing personal and financial information as well as health information is not accessible online and that access to such data is password-protected.

126.   Further, as a result of Defendant's conduct, Plaintiff and Class members are forced to live with the anxiety that their Private Information—which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

127.   Defendant's delay in identifying and reporting the Data Breach caused additional harm. In a data breach, time is of the essence to reduce the imminent misuse of PII and PHI. Early notification helps victims of a Data Breach mitigate their injuries, and in the converse, delayed notification causes more harm and increases the risk of identity theft. Here, Defendant knew of the breach *since October 4, 2024,* but did not notify the victims until March 14, 2025. Yet Defendant offered no explanation of purpose for the delay. This delay violates HIPAA and other notification requirements and increased the injuries to Plaintiff and Class.

## CLASS ALLEGATIONS

128.   Plaintiff brings all counts, as set forth below, individually and as a Class action, pursuant to the provisions of the Fed. R. Civ. P. 23, on behalf of a Class

defined as:

> All persons in the United States who had their Private Information submitted to Defendant or Defendant's affiliates and/or whose Private Information was compromised as a result of the data breach(es) by Defendant, including all who received a Notice of the Data Breach (the "Class").

129.   Excluded from the Class are Defendant, its subsidiaries and affiliates, officers and directors, any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

130.   This proposed Class definition is based on the information available to Plaintiff at this time. Plaintiff may modify the Class definition in an amended pleading or when they move for Class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

131.   **Numerosity – Fed. R. Civ. P. 23(a)(1)**: Plaintiff is informed and believes, and thereon allege, that there are at minimum, hundreds of thousands of members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through Defendant's records, including but not limited to the files implicated in the Data Breach, but based on public information, the Class includes more than 827,000 individuals.

132.   **Commonality – Fed. R. Civ. P. 23(a)(2):** This action involves questions of law and fact common to the Class. Such common questions include, but

are not limited to:

  a.    Whether Defendant failed to timely notify Plaintiff of the Data Breach;

  b.    Whether Defendant had a duty to protect the PHI and PII of Plaintiff and Class members;

  c.    Whether Defendant was negligent in collecting and storing Plaintiff and Class members' PHI and PII, and breached its duties thereby;

  d.    Whether Defendant breached its fiduciary duty to Plaintiff and the Class;

  e.    Whether Defendant breached its duty of confidence to Plaintiff and the Class;

  f.    Whether Defendant violated its own Privacy Practices;

  g.    Whether Defendant entered a contract implied in fact with Plaintiff and the Class;

  h.    Whether Defendant breached that contract by failing to adequately safeguard Plaintiff and Class members' PHI and PII;

  i.    Whether Defendant was unjustly enriched;

  j.    Whether Plaintiff and Class members are entitled to damages as a result of Defendant' wrongful conduct; and

  k.    Whether Plaintiff and Class members are entitled to restitution as a result of Defendant' wrongful conduct.

133.    **Typicality – Fed. R. Civ. P. 23(a)(3)**: Plaintiff's claims are typical of the claims of the members of the Class. The claims of the Plaintiff and members of the Class are based on the same legal theories and arise from the same unlawful and

willful conduct. Plaintiff and members of the Class all had information stored in Defendant's system, each having their PHI and PII exposed and/or accessed by an unauthorized third party.

134. **Adequacy of Representation – Fed. R. Civ. P. 23(a)(3)**: Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the other Class members Plaintiff seeks to represent; Plaintiff has retained counsel competent and experienced in complex Class action litigation; Plaintiff intends to prosecute this action vigorously; and Plaintiff's counsel have adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed. Furthermore, the interests of the Class members will be fairly and adequately protected and represented by Plaintiff and Plaintiff's counsel.

135. **Injunctive Relief, Fed. R. Civ. P. 23(b)(2):** Defendant has acted and/or refused to act on grounds that apply generally to the Class therefore making injunctive and/or declaratory relief appropriate with respect to the Class under 23(b)(2).

136. **Superiority, Fed. R. Civ. P. 23(b)(3):** A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct

of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

137.    Defendant has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

138.    Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a.    Whether Defendant failed to timely and adequately notify the public of the Data Breach;

b.    Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their PHI and PII;

c.    Whether Defendant's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

d.    Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

e.    Whether Defendant failed to take commercially reasonable steps to safeguard consumer PHI and PII; and

f.    Whether adherence to FTC data security recommendations and measures recommended by data security experts would have reasonably prevented the Data Breach.

139.   Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class members' names and addresses affected by the Data Breach. Defendant has already preliminarily identified Class members for the purpose of sending notice of the Data Breach.

## FIRST CAUSE OF ACTION
## NEGLIGENCE
### (Plaintiff on behalf of the Class)

140.   Plaintiff restates and realleges the preceding allegations above as if fully alleged herein.

141.   Plaintiff brings this claim individually and on behalf of the Class.

142.   Defendant owed a duty to Plaintiff and Class members to exercise reasonable care in safeguarding and protecting their PHI and PII in its possession, custody, and control.

143.   Defendant's duty to use reasonable care arose from several sources, including but not limited to those described below.

144.   Defendant had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class members were the foreseeable and probable victims of any inadequate security practices on the part of the Defendant. By collecting and storing valuable PHI and PII that is routinely targeted by criminals for unauthorized access, Defendant was obligated to act with reasonable care to protect against these foreseeable threats.

145.   Defendant's duty also arose from the fact that it holds itself out as a trusted provider of financial services, and thereby assumes a duty to reasonably protect consumers' information.

146.   Defendant breached the duties owed to Plaintiff and Class members and

thus was negligent. As a result of a successful attack directed towards Defendant that compromised Plaintiff and Class members' PHI and PII, Defendant breached its duties through some combination of the following errors and omissions that allowed the data compromise to occur:

    a.    mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PHI and PII;

    b.    mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks;

    c.    failing to design and implement information safeguards to control these risks;

    d.    failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures;

    e.    failing to evaluate and adjust its information security program in light of the circumstances alleged herein;

    f.    failing to detect the breach at the time it began or within a reasonable time thereafter;

    g.    failing to follow its own privacy policies and practices published to its consumers; and

    h.    failing to adequately train and supervise employees and third-party vendors with access or credentials to systems and databases containing sensitive PHI and PII.

147.  But for Defendant's wrongful and negligent breach of its duties owed

to Plaintiff and Class members, their PHI and PII would not have been compromised.

148.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class members have suffered injuries, including, but not limited to:

a.    Theft of their PHI and PII;

b.    Costs associated with the detection and prevention of identity theft and unauthorized use of their PHI and PII;

c.    Costs associated with purchasing credit monitoring and identity theft protection services;

d.    Lowered credit scores resulting from credit inquiries following fraudulent activities;

e.    Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.    The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PHI and PII being placed in the hands of criminals;

g.    Damages to and diminution in value of their PHI and PII entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class members' data against theft and not allow access and misuse of their data by others;

h.    Continued risk of exposure to hackers and thieves of their PHI and

PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class members' data; and

    i.   Emotional distress from the unauthorized disclosure of PHI and PII to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class members.

149.   As a direct and proximate result of Defendant's negligence, Plaintiff and Class members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

## NEGLIGENCE *PER SE*

### (Plaintiff on behalf of the Class)

150.   Plaintiff restates and realleges the preceding allegations above as if fully alleged herein.

151.   Plaintiff brings this claim individually and on behalf of the Class.

152.   Section 5 of the FTC Act prohibits "unfair … practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by entities such as Defendant for failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Defendant's duty.

153.   Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with the industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of

PII it obtained and stored and the foreseeable consequences of a data breach involving PII of its consumers.

154.   Plaintiff and Class members are consumers within the Class of persons Section 5 of the FTC Act was intended to protect.

155.   Defendant's violation of Section 5 of the FTC Act constitutes negligence *per se*.

156.   The harm that has occurred as a result of Defendant's conduct is the type of harm that the FTC Act and Part 2 were intended to guard against.

157.   As a direct and proximate result of Defendant's negligence, Plaintiff has been injured as described herein, and is entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**

**BREACH OF FIDUCIARY DUTY**

**(Plaintiff on behalf of the Class)**

158.   Plaintiff restates and realleges the preceding allegations above as if fully alleged herein.

159.   Plaintiff and Class members have an interest, both equitable and legal, in the PHI and PII about them that was conveyed to, collected by, and maintained by Defendant and that was ultimately accessed or compromised in the Data Breach.

160.   As a provider of financial services and a recipient of consumers' PHI and PII, Defendant has a fiduciary relationship to its consumers, including Plaintiff and Class members.

161.   Because of that fiduciary relationship, Defendant was provided with and stored private and valuable PHI and PII related to Plaintiff and the Class. Plaintiff and the Class were entitled to expect their information would remain

confidential while in Defendant's possession.

162. Defendant owed a fiduciary duty under common law to Plaintiff and Class members to exercise the utmost care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PHI and PII in Defendant's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

163. As a result of the parties' fiduciary relationship, Defendant had an obligation to maintain the confidentiality of the information within Plaintiff's and Class members' PHI and PII.

164. Defendant's consumers, including Plaintiff and Class members, have a privacy interest in personal financial matters, and Defendant had a fiduciary duty not to such personal data of its consumers.

165. As a result of the parties' relationship, Defendant had possession and knowledge of confidential PHI and PII of Plaintiff and Class members, information not generally known.

166. Plaintiff and Class members did not consent to nor authorize Defendant to release or disclose their PHI and PII to unknown criminal actors.

167. Defendant breached its fiduciary duties owed to Plaintiff and Class members by, among other things:

    a.    mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PHI and PII;

    b.    mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks;

c.      failing to design and implement information safeguards to control these risks;

d.      failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures;

e.      failing to evaluate and adjust its information security program in light of the circumstances alleged herein;

f.      failing to detect the breach at the time it began or within a reasonable time thereafter;

g.      failing to follow its own privacy policies and practices published to its consumers; and

h.      failing to adequately train and supervise employees and third-party vendors with access or credentials to systems and databases containing sensitive PHI and PII.

168.   But for Defendant's wrongful breach of its fiduciary duties owed to Plaintiff and Class members, their PHI and PII would not have been compromised.

169.   As a direct and proximate result of Defendant's negligence, Plaintiff and Class members have suffered injuries, including:

a.      Theft of their PHI and PII;

b.      Costs associated with the detection and prevention of identity theft and unauthorized use of their PHI and PII;

c.      Costs associated with purchasing credit monitoring and identity theft protection services;

d.      Lowered credit scores resulting from credit inquiries following fraudulent activities;

e.      Costs associated with time spent and the loss of productivity from

taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.    The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PHI and PII being placed in the hands of criminals;

g.    Damages to and diminution in value of their PHI and PII entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's data against theft and not allow access and misuse of their data by others;

h.    Continued risk of exposure to hackers and thieves of their PHI and PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's data; and

i.    Emotional distress from the unauthorized disclosure of Plaintiff's PHI and PII to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff.

170.    As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

## BREACH OF CONFIDENCE

### (Plaintiff on behalf of the Class)

171.   Plaintiff restates and realleges the preceding allegations above as if fully alleged herein.

172.   Plaintiff and Class members have an interest, both equitable and legal, in the PHI and PII about them that was conveyed to, collected by, and maintained by Defendant and that was ultimately accessed or compromised in the Data Breach.

173.   As a provider of financial services and a recipient of consumers' PHI and PII, Defendant has a fiduciary relationship to its consumers, including Plaintiff and Class members.

174.   Plaintiff provided Defendant with her personal and confidential PHI and PII under both the express and/or implied agreement of Defendant to limit the use and disclosure of such PHI and PII.

175.   Defendant owed a duty to Plaintiff to exercise the utmost care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PHI and PII in its possession from being compromised, lost, stolen, accessed by, misused by, or disclosed to unauthorized persons.

176.   As a result of the parties' relationship, Defendant had possession and knowledge of confidential PHI and PII of Plaintiff.

177.   Plaintiff's PHI and PII is not generally known to the public and is confidential by nature.

178.   Plaintiff did not consent to nor authorize Defendant to release or disclose her PHI and PII to an unknown criminal actor.

179.   Defendant breached the duties of confidence it owed to Plaintiff when Plaintiff's PHI and PII were disclosed to unknown criminal hackers.

180.   Defendant breached its duties of confidence by failing to safeguard Plaintiff's and Class members' PHI and PII, including by, among other things: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PHI and PII; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its on privacy policies and practices published to its consumers; (h) storing PHI and PII in an unencrypted and vulnerable manner, allowing its disclosure to hackers; and (i) making an unauthorized and unjustified disclosure and release of Plaintiff's PHI and PII to a criminal third party.

181.   But for Defendant's wrongful breach of its duty of confidence owed to Plaintiff, her privacy, confidences, PHI and PII would not have been compromised.

182.   As a direct and proximate result of Defendant's breach of Plaintiff's confidences, Plaintiff has suffered injuries, including:

   a.   Theft of her PHI and PII;

   b.   Costs associated with the detection and prevention of identity theft and unauthorized use of her PHI and PII;

   c.   Costs associated with purchasing credit monitoring and identity theft protection services;

   d.   Lowered credit scores resulting from credit inquiries following

fraudulent activities;

e.  Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the California Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.  The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PHI and PII being placed in the hands of criminals;

g.  Damages to and diminution in value of her PHI and PII entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's data against theft and not allow access and misuse of their data by others;

h.  Continued risk of exposure to hackers and thieves of her PHI and PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's data; and

i.  Loss of personal time spent carefully reviewing statements from health insurers and providers to check for charges for services not received, as directed to do by Defendant.

183.  Additionally, Defendant received payments from Plaintiff for services with the understanding that Defendant would uphold its responsibilities to maintain the confidences of Plaintiff's PHI and PII.

184.   Defendant breached the confidence of Plaintiff when it made an unauthorized release and disclosure of her PHI and PII and, accordingly, it would be inequitable for Defendant to retain the benefit at Plaintiff's expense.

185.   As a direct and proximate result of Defendant's breach of its duty of confidences, Plaintiff and the Class are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or disgorgement or restitution, in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
## INTRUSION UPON SECLUSION/INVASION OF PRIVACY
### (Plaintiff on behalf of the Class)

186.   Plaintiff restates and realleges the preceding allegations above as if fully alleged herein.

187.   Plaintiff had a reasonable expectation of privacy in the PHI and PII Defendant mishandled.

188.   Defendant's conduct as alleged above intruded upon Plaintiff and Class members' seclusion under common law.

189.   By intentionally failing to keep Plaintiff's PHI and PII safe, and by intentionally misusing and/or disclosing said information to unauthorized parties for unauthorized use, Defendant intentionally invaded Plaintiff and Class members' privacy by:

   a.   Intentionally and substantially intruding into Plaintiff and Class members' private affairs in a manner that identifies Plaintiff and Class members and that would be highly offensive and objectionable to an ordinary person;

   b.   Intentionally publicizing private facts about Plaintiff and Class

members, which is highly offensive and objectionable to an ordinary person; and

   c.    Intentionally causing anguish or suffering to Plaintiff and Class members.

190. Defendant knew that an ordinary person in Plaintiff or Class members' position would consider Defendant's intentional actions highly offensive and objectionable.

191. Defendant invaded Plaintiff and Class members' right to privacy and intruded into Plaintiff's and Class members' private affairs by intentionally misusing and/or disclosing their PHI and PII without their informed, voluntary, affirmative, and clear consent.

192. Defendant intentionally concealed from, and delayed reporting to, Plaintiff and Class members a security incident that misused and/or disclosed their PHI and PII without their informed, voluntary, affirmative, and clear consent.

193. The conduct described above was directed at Plaintiff and Class members.

194. As a proximate result of such intentional misuse and disclosures, Plaintiff's and Class members' reasonable expectations of privacy in their PHI and PII was unduly frustrated and thwarted. Defendant's conduct amounted to a substantial and serious invasion of Plaintiff's and Class members' protected privacy interests causing anguish and suffering such that an ordinary person would consider Defendant's intentional actions or inaction highly offensive and objectionable.

195. In failing to protect Plaintiff's and Class members' PHI and PII, and in intentionally misusing and/or disclosing their PHI and PII, Defendant acted with intentional malice and oppression and in conscious disregard of Plaintiff and Class

members' rights to have such information kept confidential and private. Plaintiff, therefore, seeks an award of damages on behalf of herself and the Class.

196.   As a direct and proximate result of Defendant's conduct, Plaintiff and Class members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**SIXTH CAUSE OF ACTION**

**BREACH OF IMPLIED CONTRACT**

**(Plaintiff on behalf of the Class)**

197.   Plaintiff restates and realleges the preceding allegations above as if fully alleged herein. re

198.   Plaintiff brings this claim individually and on behalf of the Class.

199.   When Plaintiff and Class members provided their PHI and PII to Defendant in exchange for education services, they entered into implied contracts with Defendant, under which Defendant agreed to take reasonable steps to protect Plaintiff's and Class members' PHI and PII, comply with statutory and common law duties to protect their PHI and PII, and to timely notify them in the event of a data breach.

200.   Defendant solicited and invited Plaintiff and Class members to provide their PHI and PII as part of Defendant's provision of services. Plaintiff and Class members accepted Defendant's offers and provided their PHI and PII to Defendant.

201.   When entering into implied contracts, Plaintiff and Class members reasonably believed and expected that Defendant's data security practices complied with its statutory and common law duties to adequately protect Plaintiff's PHI and PII and to timely notify them in the event of a data breach.

202.   Defendant's implied promise to safeguard consumers' PHI and PII is

evidenced by, *e.g.*, the representations in Defendant's Notice of Privacy Practices set forth above.

203.    Plaintiff and Class members paid money to Defendant in order to receive services. Plaintiff and Class members reasonably believed and expected that Defendant would use part of those funds to obtain adequate data security. Defendant failed to do so.

204.    Plaintiff and Class members would not have provided their PHI and PII to Defendant had they known that Defendant would not safeguard their PII, as promised, or provide timely notice of a data breach.

205.    Plaintiff and Class members fully performed their obligations under their implied contracts with Defendant.

206.    Defendant breached its implied contracts with Plaintiff and Class members by failing to safeguard Plaintiff and Class members' PHI and PII and by failing to provide them with timely and accurate notice of the Data Breach.

207.    The losses and damages Plaintiff and Class members sustained include, but are not limited to:

       a.    Theft of their PHI and PII;

       b.    Costs associated with purchasing credit monitoring and identity theft protection services;

       c.    Costs associated with the detection and prevention of identity theft and unauthorized use of their PHI and PII;

       d.    Lowered credit scores resulting from credit inquiries following fraudulent activities;

       e.    Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate,

and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.    The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PHI and PII being placed in the hands of criminals;

g.    Damages to and diminution in value of their PHI and PII entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class members' data against theft and not allow access and misuse of their data by others;

h.    Continued risk of exposure to hackers and thieves of their PHI and PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff and Class members' data; and

i.    Emotional distress from the unauthorized disclosure of PHI and PII to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class members.

208.  As a direct and proximate result of Defendant's breach of contract, Plaintiff and Class members are entitled to damages, including compensatory,

punitive, and/or nominal damages, in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION

### UNJUST ENRICHMENT

#### (Plaintiff on behalf of the Class)

209.  Plaintiff restates and realleges the preceding allegations above as if fully alleged herein.

210.  Plaintiff brings this claim individually and on behalf of the Class in the alternative to Plaintiff's' implied contract claim.

211.  Upon information and belief, Defendant funds its data security measures entirely from its general revenue, including payments made by or on behalf of Plaintiff and Class members.

212.  As such, a portion of the payments made by or on behalf of Plaintiff and Class members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

213.  Plaintiff and Class members conferred a monetary benefit on Defendant. Specifically, they purchased services from Defendant and/or its agents and in so doing provided Defendant with their PHI and PII. In exchange, Plaintiff and Class members should have received from Defendant the services that were the subject of the transaction and have their PHI and PII protected with adequate data security.

214.  Defendant knew that Plaintiff and Class members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the PHI and PII of Plaintiff and Class members for business purposes.

215.  In particular, Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff and Class

members' PHI and PII. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to increase its own profits at the expense of Plaintiff and Class members by utilizing cheaper, ineffective security measures. Plaintiff and Class members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

216.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class members, because Defendant failed to implement appropriate data management and security measures that are mandated by its common law and statutory duties.

217.    Defendant failed to secure Plaintiff's and Class members' PHI and PII and, therefore, did not provide full compensation for the benefit Plaintiff and Class members provided.

218.    Defendant acquired the PHI and PII through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

219.    If Plaintiff and Class members knew that Defendant had not reasonably secured their PHI and PII, they would not have agreed to provide their PHI and PII to Defendant.

220.    Plaintiff and Class members have no adequate remedy at law.

221.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class members have suffered injuries, including, but not limited to:

     a.    Theft of their PHI and PII;

     b.    Costs associated with purchasing credit monitoring and identity theft protection services;

     c.    Costs associated with the detection and prevention of identity

theft and unauthorized use of their PHI and PII;

d.    Lowered credit scores resulting from credit inquiries following fraudulent activities;

e.    Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f.    The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PHI and PII being placed in the hands of criminals;

g.    Damages to and diminution in value of their PHI and PII entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff's and Class members' data against theft and not allow access and misuse of their data by others;

h.    Continued risk of exposure to hackers and thieves of their PHI and PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class members' data; and

i.    Emotional distress from the unauthorized disclosure of PHI and

PII to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiff and Class members.

222.   As a direct and proximate result of Defendant's conduct, Plaintiff and Class members have suffered and will continue to suffer other forms of injury and/or harm.

223.   Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class members, proceeds that it unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiff and Class members overpaid for Defendant's services.

## EIGHTH CAUSE OF ACTION
## DECLARATORY JUDGMENT
### (Plaintiff on behalf of the Class)

224.   Plaintiff restates and realleges the preceding allegations in the paragraphs above as if fully alleged herein.

225.   Plaintiff brings this claim individually and on behalf of the Class.

226.   Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and granting further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal statutes described in this Complaint.

227.   An actual controversy has arisen in the wake of the Data Breach regarding Defendant's present and prospective common law and other duties to reasonably safeguard Plaintiff's and Class members' PHI and PII, and whether

Defendant is currently maintaining data security measures adequate to protect Plaintiff and Class members from future data breaches that compromise their PHI and PII. Plaintiff and the Class remain at imminent risk of further compromises of their PHI and PII will occur in the future.

228. The Court should also issue prospective injunctive relief requiring Defendant to employ adequate security practices consistent with law and industry standards to protect consumers' PHI and PII.

229. Defendant still possesses the PHI and PII of Plaintiff and the Class.

230. To Plaintiff's knowledge, Defendant has made no announcement or notification that it has remedied the vulnerabilities and negligent data security practices that led to the Data Breach.

231. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another data breach at Defendant. The risk of another such breach is real, immediate, and substantial.

232. The hardship to Plaintiff and Class members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, if another data breach occurs at Defendant, Plaintiff and Class members will likely continue to be subjected to a heightened, substantial, imminent risk of fraud, identity theft, and other harms described herein. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

233. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another

data breach at Defendant, thus eliminating the additional injuries that would result to Plaintiff and Class members, along with other consumers whose PHI and PII would be further compromised.

234. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that Defendant implement and maintain reasonable security measures, including but not limited to the following:

a. Engaging third-party security auditors/penetration testers, as well as internal security personnel, to conduct testing that includes simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

b. Engaging third-party security auditors and internal personnel to run automated security monitoring;

c. Auditing, testing, and training its security personnel regarding any new or modified procedures;

d. Purging, deleting, and destroying PHI and PII not necessary for its provisions of services in a reasonably secure manner;

e. Conducting regular database scans and security checks; and

f. Routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach.

# **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, prays for relief as follows:

a.     For an Order certifying this action as a Class action and appointing Plaintiff as a Class Representative and her counsel as Class Counsel;

b.     For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff and Class members' PHI and PII, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class members;

c.     For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Personal Information compromised during the Data Breach;

d.     For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

e.     Ordering Defendant to pay for not less than three years of credit monitoring services for Plaintiff and the Class;

f.     For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

g.     For an award of punitive damages, as allowable by law;

h.     For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

i.     Pre- and post-judgment interest on any amounts awarded; and,

j.      Such other and further relief as this court may deem just and proper.

## JURY TRIAL DEMANDED

A jury trial is demanded by Plaintiff on all claims so triable.

Dated this 24th day of March 2025.

*/s/Eric Lechtzin*
Eric Lechtzin (SBN 248958)
Marc H. Edelson
(*Pro Hac Vice* anticipated)
Liberato P. Verderame
(*Pro Hac Vice* anticipated)
**EDELSON LECHTZIN LLP**
411 S. State Street, Suite N-300
Newtown, PA 18940
Telephone: (215) 867-2399
Facsimile: (267) 685-0676
Email: elechtzin@edelson-law.com
        medelson@edelson-law.com
        lverderame@edelson-law.com